## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JIM LEWARS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EFTEC NORTH AMERICA, LLC, | : | No. 14-02891 |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OPINION

**Timothy R. Rice**                                                    **January 28, 2016**
**U.S. Magistrate Judge**

Plaintiff Jim Lewars, a Pennsylvania resident and employee of Linden Bulk

Transportation, filed a negligence action against Defendant EFTEC North America, LLC

("EFTEC"), a Michigan corporation, alleging he slipped and fell on a patch of ice on a truck

ramp on EFTEC's property.   Compl. (doc. 1).   EFTEC seeks summary judgment, asserting that,

under Michigan law, EFTEC owed no duty to Lewars to protect him from the ice patch—an

open and obvious condition.   Def.'s Mot. for S.J. Br. (doc. 28).   Lewars argues summary

judgment is not appropriate because even if Michigan substantive law applies, a genuine issue of

material fact exists as to whether: 1) the ice was observable; and 2) EFTEC had actual and

constructive notice of the ice.   Compl. at 24-25.   Because I agree that questions of material fact

remain, EFTEC's motion is denied.

I.      Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   An issue

is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

Where there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, summary judgment must be awarded to the moving party. See id. at 250. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." Id. at 250-51. I must view the facts and any inferences from those facts in the light most favorable to the non-moving party. See Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010).

II.    Background

In January 2014, Lewars picked up a trailer in Bensalem, Pennsylvania, and drove to EFTEC's facility in Taylor, Michigan. 12/2/14 Lewars Dep. at 177. It did not snow on that trip. Id. Upon arriving at the EFTEC facility at 7:30 a.m. on January 16, Lewars observed traces of snow on the grass. Id. at 169, 177. He did not observe any piles of snow, and did not know when it had last snowed in the area. Id. at 177; see also 12/4/14 Walden Dep. at 26 ("I believe the parking lot was clear of ice and snow [on the morning of January 16]"). The sky was overcast but there was no active precipitation.[1] 12/2/14 Lewars Dep. at 169, 177. Lewars parked in EFTEC's parking lot to wait for another unloading truck. Id. at 171.

At 9:00 a.m., Lewars moved his truck to the offloading pad to deliver a liquid chemical, and did not notice any snow or ice on the pad. Id. at 173-74, 178. He backed the truck between the two retaining walls bordering the pad, leaving approximately five feet between the

---

[1]    Randy Sheardown, an EFTEC unloader, arrived before 6 a.m. on January 16 and described the weather as cold but with no precipitation. 12/4/14 Sheardown Dep. at 14. He testified that he "remember[ed] we had four or five mild days [before January 16]" without precipitation. Id. at 14-15.

2

passenger side and the wall, and no space between the driver side and the wall.[2]  Id. at 162-63, 180.  He met Randy Sheardown, an EFTEC employee, at the front of the truck, and the two men walked along the passenger side of the truck to retrieve a liquid chemical sample from the valve that released the chemicals at the middle of the trailer.  Id. at 158, 175.  Lewars did not look down at the ground while walking along the truck, but looked at the ground next to the tank where the sample was taken and did not notice snow or ice.  Id. at 176.

After providing a sample to Sheardown, the two men walked back toward the front of the truck.  Id. at 178.  Lewars observed Sheardown walk toward the warehouse to deliver the sample, and Sheardown had no trouble with his footing.  Id. at 172.  Lewars walked down the driver's side to the back of the tractor where the hoses were stored.  Id. at 178-79.  He did not look at the ground or feel anything slippery while walking.  Id. at 179.  Lewars climbed onto the back of the truck, removed a hose from the hose rack, and threw it on the ground on the passenger's side.  Id. at 179.  He then climbed down and walked around the front of the tractor to retrieve the hose.  Id.  After connecting the hose to the discharge port on the truck, he attempted to hook the other end of the hose to EFTEC's unloading port but discovered the hose was too short.  Id. at 182.  Lewars walked around the front of the trailer a third time to retrieve another hose from the passenger's side of his rig, and then a fourth time to retrieve the that second hose he had thrown to the ground.  Id. at 178-83.  As he walked around the front of the truck this fourth time, Lewars stepped on an area of ground he had not previously walked on, his right foot slipped, and he fell to the ground.  Id. at 183-85.  He was looking straight ahead at the time he fell.  Id. at 186.

---

[2]     Because his truck was so close to the left retaining wall, Lewars had to exit the truck by walking on the wall. 12/2/14 Lewars Dep. at 163.

After falling, Lewars noticed a clear sheet of ice, approximately the size of a legal pad, on the ground that blended with the concrete.  Id. at 187-88.  That was the only patch of ice Lewars observed that morning.  Id. at 188.  There were no signs in the area warning about ice or slippery conditions, id. at 196, and Sheardown did not warn Lewars about slippery conditions, id. at 174-6.  Lewars did not observe plowing or other contract work in the area.[3]  Id. at 196. When Sheardown walked from the warehouse toward Lewars after he fell, Lewars again observed that Sheardown had no trouble with his footing.  Id. at 191-92.

Following Lewars's fall, Sheardown completed an accident report, noting "T-2 Tanker Pit" as the site of the accident, and "[w]ater leaking from the tank farm and freezing" as a "[d]escription of events leading to incident."  Pl.'s Resp. Ex. 2, Sheardown's Supervisor's First Report of Accident/Incident.  Roy Burgess, an EFTEC supervisor, also completed an accident report, in which he stated Lewars "was preparing to pull hoses to unload truck" at the time he fell and that "[i]ce alongside of truck well" was the "proximate cause" of the injury.  Pl.'s Resp. Ex. 3, Burgess's Supervisor's First Report of Accident/Incident.  Burgess identified the "root cause" of the accident as "[i]ce on pavement surface along joint between Tank Farm and truck well formed from surficial water leaking through joint."  Id.  He further stated the shipping attendant was instructed "to apply ice melter to ice forming along joint" as the "corrective actions" taken "to prevent reoccurrence."  Id.

Before Lewars's fall, EFTEC employees had been aware of a persisting problem of water and ice accumulation in the area of the unloading ramp.  At 6 a.m. on the day of Lewars's fall,

---

[3]     James Walden, an EFTEC engineering manager, testified that the snow removal contractor plowed and salted the entire property, including the truck well, on January 10, 2014—six days before the accident—and again on the afternoon of the day of Lewars's accident following a snowfall.   12/4/14 Walden Dep. at 24-25.

Sheardown observed a four-foot area of ice at the bottom of the truck well, around the valve area, which was something he had observed throughout most of the winter. 12/4/14 Sheardown Dep. at 16-17. That ice formed because the pump that would otherwise remove water from the area was frozen. Id. at 18. After Lewars's fall, Sheardown also observed spotty patches of ice, approximately six inches wide, along the edge of the left retaining wall, a condition that he had observed on other occasions when the temperature was cold. Id. at 19-20. Sheardown testified the moisture along the wall of the tank farm, several feet away from where Lewars fell, was a "constant issue," id. at 20, and that it was caused by the collection of rainwater and snow near the tanks that seeped through the retaining wall, id. at 22.

Walden was aware that, shortly after the area containing the T2 truck well was built in 2009, water began leaking under the retaining wall and into the edge of the T2 truck well. 12/4/14 Walden Dep. at 13-14. A contractor applied caulk to the leaking joint, which reduced the leakage, but the wall continued to leak. Id. at 14-15. There were no additional repairs because EFTEC believed the leakage was reduced enough to resolve the issue. Id. at 17-18. Nevertheless, both before and after the accident, Walden observed a dampness that originated on the vertical surface of the wall, seeped down, and created dampness on the horizontal surface immediately adjacent to the retaining wall. Id. at 16, 18.

II.     Discussion

        A.      Conflict of Law

EFTEC argues that Michigan law applies in this case, see Def.'s Mot. for S.J. at 3-4, and Lewars argues Pennsylvania law applies, see Pl.'s Resp. to Mot. for S.J. (doc. 29) at 13-15.

"It is well established that a district court in a diversity action will apply the choice of law

5

rules of the forum state in determining which state's law will be applied to the substantive issues before it." Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir. 1988) (citing Klaxon v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941)). In Pennsylvania, courts follow a "flexible rule" that considers state policies and interests underlying the legal issue by using the "Second Restatement of Conflict of Laws as a starting point, and then flesh[ing] out the issue using an interest analysis." Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 463 (3d Cir. 2006).

The Pennsylvania choice-of-law analysis involves two steps: 1) determining whether a true conflict exists;[4] and 2) determining which state has the greater interest in the application of its law. LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996). If a "true" conflict exists, the courts weigh a state's interests by assessing the contacts each state has with the accident. The types of contacts establishing significant relationships include: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. Restatement (Second) of Conflict of Laws § 145; see Blakesley v. Wolford, 789 F.2d 236, 239 (3d Cir. 1986). Courts weigh those contacts "according to their relative importance with respect to the particular issue." Blakesley, 789 F.2d at 239 (quoting Restatement (Second) of Conflict of Laws § 145);

---

[4]     A true conflict exists if the states' laws conflict such that both states' "interests would be impaired by the application of the other's laws." Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007). There is no conflict when two jurisdictions' laws are the same, and a choice of law analysis is unnecessary. Id. A false conflict occurs when the states' laws conflict, but "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996); see also Hammersmith, 480 F.3d at 229-30.

6

see also Hammersmith, 480 F.3d at 231 ("we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the particular issue") (internal quotation marks omitted).   Courts then apply the law of the state with the more significant interests, i.e., the "the jurisdiction most intimately concerned with the outcome of the particular litigation."   Blakesley, 789 F.2d at 238; see also McDowell v. Kmart Corp., No. CIVA 06-CV-02508, 2006 WL 1967363, at *1 (E.D. Pa. July 12, 2006).

Applying the first step of Pennsylvania's choice-of-law analysis, I note that both Pennsylvania and Michigan courts follow the Restatement (Second) of Torts § 343 when deciding the liability of a possessor of land.   See Kirschbaum v. WRGSB Assocs., 243 F.3d 145, 152 (3d Cir. 2001); Meyers v. Wal-Mark Stores, East, Inc., 29 F.Supp.2d 780, 783 (E.D. Mich. 1998).   Under the Restatement, a possessor of land is liable for the physical harm caused to an invitee by a land condition if the possessor: 1) knows of or, by the exercise of reasonable care, should have discovered the condition, and should have realized it involved unreasonable risk of harm to the invitee; 2) should have expected the invitee would not discover or realize the danger, or would fail to protect themselves against it; and 3) failed to exercise reasonable care to protect the invitee against the danger.   Restatement (Second) of Torts § 343.

The Restatement further provides: "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate their harm despite such knowledge or obviousness."[5]   Id. § 343A(1).   Courts applying Michigan and Pennsylvania law also have held

---

[5]     A "known" danger "denotes not only knowledge of the existence of the condition . . . but also appreciation of the danger it involves."   Restatement (Second) of Torts § 343A, Cmmt b. An "obvious" danger requires that "the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception,

that an obvious danger may protect a defendant from liability.   See Kessler v. Visteon Corp.,
448 F.3d 326, 336 (6th Cir. 2006) (discussing the open and obvious doctrine whereby an "open
and obvious nature of the hazard obviate[s] any duty" defendant may have owed as property
owner); Monk v. Virgin Islands Water & Power Authority, 53 F.3d 1381 (3d Cir. 1995) (the
Second Restatement's "Known or Obvious Dangers" section "was intended as a variation on the
doctrine of assumption of the risk" as a bar to recovery).

Courts in both states further impose a higher burden on injured plaintiffs because of
unavoidable weather conditions, such as wintry weather.   The Michigan Supreme Court has
noted Michigan's unique position: "Michigan, being above the 42nd parallel of north latitude, is
prone to winter.   And with winter comes snow and ice accumulations on sidewalks, parking lots,
roads, and other outdoor surfaces.   Unfortunately, the accumulation of snow, ice, and other
slippery hazards on surfaces regularly traversed by the citizens of this state results in
innumerable mishaps and injuries each year."   Hoffner v. Lanctoe, 821 N.W.2d 88, 91 (Mich.
2012).   Michigan courts, therefore, have continually held that residents should take weather
conditions into account in their assessment of risk.   See Barbaglia v. Nonconnah Holdings,
LLC, 566 Fed.Appx. 456, 458 (6th Cir. 1014) ("dangerous conditions created by the natural
accumulation of snow or ice are considered to be among the normal hazards of life"); Slaughter
v. Blarney Castle Oil Co., 760 N.W.2d 287, 292 (Mich. App. 2008) ("[R]easonable Michigan
winter residents know that each day can bring dramatically different weather conditions, ranging
from blizzard conditions, to wet slush, to a dry, clear, and sunny day.); id. at 290 ("When
applying the open and obvious danger doctrine to conditions involving the natural accumulation

---

intelligence, and judgment."   Id.

8

of ice and snow . . . our courts have progressively imputed knowledge regarding the existence of

a condition as should reasonably be gleaned from . . . common knowledge of weather hazards

that occur in Michigan during winter months."); Buhalis v. Trinity Continuing Care Services,

822 N.W.2d 254, 259 (Mich. App. 2012) ("Generally, the hazard presented by snow and ice is

open and obvious, and the landowner has not duty to warn of or remove the hazard.") (internal

quotation marks omitted); Benton v. Dart Props. Inc., 715 N.W.2d 335, 340 n.2 (2006) ("there is

no general duty of inviters to take reasonable measures to remove snow and ice for the benefit of

invitees unless the accumulation meets the . . . high standard of creating an unreasonable risk of

danger") (citing Mann v. Shusteric Enterprises, Inc., 683 N.W.2d 573 (Mich. 2004)).

      Although Pennsylvania courts also require people to be knowledgeable of wintry

conditions, the law is not as well developed as in Michigan.   See Beck v. Holly Tree

Homeowners Ass'n, 689 F. Supp. 2d 756, 762 (E.D. Pa. 2010) ("to require one's walks be

always free of ice and snow would be to impose an impossible burden in view of the climatic

conditions in this hemisphere"); Mack v. AAA Mid-Atlantic, Inc., 511 F. Supp. 2d 539, 547

(E.D. Pa. 2007) ("Under Pennsylvania law, property owners do not have an absolute duty to keep

their premises and abutting sidewalks completely free from snow and ice at all times.");

Kellyhouse v. Stanley Works, Inc., No. 96-551, 1996 WL 385634, at *1 (E.D. Pa. July 10, 1996)

("the only duty upon the property owner or tenant is to act within a reasonable time after notice

to remove [snow and ice] when it is in a dangerous condition").

      Because of the potential conflict between the two states' laws, I must move to the second

stage of the conflict-of-analysis test, and assess the relative importance of the states' interests in

having their laws applied.   See Ramey v. Wal-Mart, Inc., 967 F. Supp. 843, 844-45 (E.D. Pa.

1997).  EFTEC argues the application of the Restatement (Second) of Conflict of Laws § 145

factors weighs in favor of the application of Michigan law.  Def.'s Reply Br. at 4.  I agree.

Here, the domicile of the parties is a neutral factor because Lewars is a citizen and

resident of Pennsylvania, and EFTEC is a Michigan corporation with a place of business in

Michigan.  See Compl. at 1; Def.'s Mot. for S.J. at 1.  However, the place of the injury and any

conduct giving rise to that injury occurred in Michigan.[6]  The place where the parties'

relationship is centered also favors Michigan law because the transaction between Lewars and

EFTEC occurred in Michigan.  See Marsico v. Marsico, No. 2:14-CV-00397, 2015 WL

3466159, at *6 (W.D. Pa. June 1, 2015).

Furthermore, the courts in this circuit have applied the law of a foreign state in cases

where a Pennsylvania resident falls on a foreign corporation's property in the foreign state.[7]  See

_____

[6]   Even though Pennsylvania has rejected strict adherence to lex loci delicti, the location of
a slip and fall remains important in the conflict-of-law analysis.  See Shuder, 859 F.2d at 272
(defendant-landowner's state had "by far the more significant contacts" where the "accident
arose from the use of and condition of property, traditionally matters of local control");
Blakesley, 789 F.2d at 243 ("where . . . the place of where the injury occurred was not fortuitous,
as for example, in an airplane crash, the place of injury assumes much greater importance, and in
some instances may be determinative"); Ramey v. Wal-Mart, Inc., 967 F. Supp. 843, 845 (E.D.
Pa. June 26, 1997) ("While Pennsylvania has rejected strict adherence to lex loci delicti, this
rejection cannot be read as discounting the importance of the location of the accident."); Tonkon
v. Denny's, Inc., 650 F. Supp. 119, 121 (E.D. Pa. Dec. 22, 1986) (applying Mexico law where
Pennsylvania invitee fell on sidewalk outside restaurant in Mexico, and only significant contact
Pennsylvania had with the injury is the plaintiff's domicile); see also Shuder, 859 F.2d at 272
("Pennsylvania courts have not hesitated to apply foreign over domestic law even though they
thereby bar claims by their residents.").

[7]   Lewars argues Pennsylvania law applies because it has a strong interest in protecting
Pennsylvania citizens, relying primarily on Kunreuther v. Outboard Marine Corp., 749 F. Supp.
658 (E.D. Pa. 1990).  Pl.'s Resp. to Mot. for S.J. at 13-14.  In Kunreuther, this Court applied
Pennsylvania law rather than Jamaican law to a suit against a motor manufacturer, where the
decedent, a Pennsylvania resident, was killed when she was struck by a propeller in Jamaican
waters.  This Court found that because the defendant was a Delaware Corporation with its
principal place of business in Illinois, Jamaica had no other contact with the matter besides being

10

Shuder v. McDonald's Corp., 859 F.2d 266, 272 (3d Cir. 1988) (applying Virginia law where fall occurred in Virginia and plaintiff's residency was the only contact with Pennsylvania); Ramey v. Wal-Mart, Inc., 967 F. Supp. 843, 844-45 (E.D. Pa. 1997) (applying New Jersey law where Pennsylvania resident fell in New Jersey store because: 1) defendant's store was located in New Jersey; 2) plaintiff had traveled to New Jersey to visit the store; 3) defendant could reasonably be expected to fashion its conduct according to New Jersey law; and 4) New Jersey's interest in maintenance and safety of its property, and the safety of its visitors); Marsico, 2015 WL 3466159, at *5-7 (applying North Carolina law where Pennsylvania resident was injured in North Carolina, conduct causing the injury occurred in North Carolina, and defendant was North Carolina resident).   Thus, I shall apply Michigan law.

     B.     Premises Liability

          I.   Open and Obvious Doctrine

Under Michigan law, if a plaintiff's injury arises solely from a defendant's duty as an owner or possessor of land, the "action sounds in premises liability rather than ordinary negligence," which holds "true even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury." Buhalis v. Trinity Continuing Care Services, 822 N.W.2d 254, 258 (Mich. App. 2012). "In a premises liability action, a plaintiff must prove the elements of negligence: 1) the defendant owed the plaintiff a duty; 2) the defendant breached that duty; 3) the breach was the proximate cause of the plaintiff's injury; and 4) the plaintiff suffered damages." Id. (internal quotation marks omitted). "Generally, an

---

the site of the accident, and its interests were not directly implicated.  Kunreuther, 749 F. Supp. at 659.  Pennsylvania, on the other hand, had a "more compelling reason to apply its law" because it had a strong interest in protecting its citizens.  Id.  Here, however, the site of injury is also the citizenship of one party, and, therefore, Kunreuther is not instructive.

owner of land owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land," including snow and ice conditions.  Id.; see also Hoffner v. Lanctoe, 821 N.W.2d 88, 91 (Mich. 2012).

However, a landowner "is generally not required to protect an invitee from open and obvious dangers," the logic being that "an obvious danger is no danger to a reasonably careful person."  Slaughter, 760 N.W.2d at 289 (internal quotation marks omitted).   The open and obvious dangers doctrine encompasses dangers that are "known to the invitee or are so obvious that the invitee might reasonably be expected to discover them."   Buhalis, 822 N.W.2d at 259. In such cases, an owner owes no duty to protect or warn the invitee unless "he should anticipate the harm despite knowledge of it on behalf of the invitee."[8]  Id. (internal quotation marks omitted).

In determining whether the open and obvious doctrine applies in a snow and ice case, Michigan courts ask whether, given the particular circumstances and surrounding conditions, a reasonably prudent person would foresee the danger.   See Shane v. Accor North America, Inc., 2013 WL 4070471, at *4 (E.D. Mich. Aug. 12, 2013).   If a slip and fall occurred on clear or "black ice," "the surrounding circumstances and specific weather conditions are highly relevant." Id.  In Slaughter, the pivotal Michigan black ice case, the plaintiff slipped on black ice and fell in a gas station parking lot.   The court found that by definition, black ice is "invisible or nearly invisible," and thus held that in order for black ice to be considered "open and obvious," there must be "evidence that the [ice] would have been visible on casual inspection before the fall or

---

[8]     The doctrine applies both to cases where a defendant failed to warn the plaintiff of a dangerous condition and where a defendant breached a duty in allowing the condition to exist. Millikin v. Walton Manor Mobile Home Park, Inc., 595 N.W.2d 152, 153 (Mich. App. 1999).

without other indicia of a potentially hazardous condition." Slaughter, 760 N.W.2d at 292.

Because there was no snow on the ground, it had not snowed in a week, the plaintiff had not

observed anyone else slipping, and she did not see the ice before she fell or "readily see it

afterwards," the court found that, in the absence of snow, an average user of ordinary intelligence

would not have been able to discover the black ice upon casual inspection.   Id.

     Thus, in analyzing the objective nature of the condition of the premises where a plaintiff

slipped on black ice, Michigan courts consider "indicia of a potentially hazardous conditions"

such as: 1) recent and current weather conditions, including temperature and precipitation; 2)

whether there was snow on the ground; and 3) whether the plaintiff had observed anyone

slipping on the premises prior to his accident.   See id.; Holguin v. Ford Motor Company, 2012

WL 676658 (Mich. App. Mar. 1, 2012).

     EFTEC argues the patch of ice Lewars slipped on was "open and obvious" under

Michigan law because it was visible to Lewars.[9]   Def.'s Mot. for S.J. at 9.   EFTEC cites

numerous Michigan cases holding that the black ice on which a plaintiff slipped and fell was

"open and obvious."   See id. at 8-13; Def.'s Reply at 8-10.   However, in all of these cases, the

weather conditions were more severe than in the present case.   For example, in Young v.

Michigan Tree Apartments LLC, 2015 WL 2414498 (Mich. App. May 19, 2015), the winter

weather conditions created a much clearer "indicia of potentially hazardous conditions," as there

---

[9]     The evidence showed that the ice on which Lewars slipped was clear, if not black.
When asked whether the ice that he noticed after falling was "black ice," Lewars stated, "If that's
what you call it.   I call it clear ice that blends in with the concrete.   It's clear."   Lewars Dep. at
187.   He further testified that he believed black ice was different because it "means you can't
see it at all," whereas he "could see when [he] put [his] hand down to try to get back up, [he]
could see that it was a clear piece of ice."   Id. at 188.   Whether ice is "clear" or "black," courts
still apply the Slaughter analysis.   See Buhalis, 822 N.W.2d at 259.

was: "a lot of snow around plaintiff's apartment building and . . . tenants had a problem with parking lots not being clear of snow;" "a 'light dusting' of snow outside;" "snow-banks near the sidewalk;" and "patches of ice and snow on the sidewalk near the exit of the building."   2015 WL 2414498, at *3.

Similarly, in Buhalis, the evidence showed: 1) it had rained and snowed the day before plaintiff's fall; 2) the plaintiff saw the patch of ice on which she slipped only after she fell; 3) the plaintiff "had lived through 85 Michigan winters" and she knew that even when sidewalks are clear there is danger of black ice; 4) the plaintiff knew that ice could be present from water runoff and purposely parked her vehicle away from potential runoff; 5) and the plaintiff was aware of the defendant's posted caution sign warning that the common areas could be wet, snow-covered, and slippery, and thus voluntarily exposed herself to danger.[10]   Id. at 259-60.

Other black ice cases also demonstrate that whether a patch of black ice was open and obvious depends on the extent of the weather conditions and what the plaintiff observed before falling.   See Hoffner, 821 N.W.2d at 101 (open and obvious doctrine applied where plaintiff observed the ice and knew the ice posed a danger but decided the risk worth assuming); Janson v. Sajewski Funeral Home, Inc., 782 N.W.2d 201, 201 (Mich. 2010) (summary judgment for the defendant-landowner was proper where the "wintry conditions" included: 1) temperatures at all times below freezing; 2) snow present around the defendant's premises; 3) mist and light

---

[10]   EFTEC also argues this case is analogous to Holguin v. Ford Motor Co., No. 302170, 2012 WL 676658 (Mich. App. Mar. 1, 2012), in which a truck driver slipped on ice and fell in the defendant's shipping and receiving lot, and noticed the patch of ice only after falling.   Def.'s Mot. for S.J. at 11-12; Def.'s Reply at 9.   The Holguin court found that because the driver could subsequently see the ice, it was not "black ice" and thus presented an open and obvious danger. 2012 WL 676658, at *2.   However, as Lewars argues, see Pl.'s Resp. at 21, one unpublished Michigan Appellate Court opinion is not dispositive.   Furthermore, the patch of ice in Holguin

14

freezing rain falling earlier in the day; and 4) light snow falling during the period prior to the plaintiff's fall); Kaseta v. Binkowski, 741 N.W.2d 15, 15 (Mich. 2007) (open and obvious doctrine applied when it had snowed earlier in the day, and there were fluctuating temperatures, mounds of shoveled snow in the area, and wet and slushy streets); Kenny v. Kaatz Funeral Home, Inc., 697 N.W. 2d 526, 526 (Mich. 2005) (open and obvious black ice where it was snowing at time of fall, plaintiff slipped and fell in snow-covered parking lot, and plaintiff observed three of her companions get out of car and hold onto it for support); Ottman v. Great Lakes Gaming of Michigan, LLC, 2012 WL 6178156, at *3 (Mich. App. Dec. 11, 2012) (applying open and obvious doctrine to black ice where plaintiff slipped in parking lot with a "presence of snow and ice," "glistening black surfaces," surrounded by "sidewalks bracketed by walls of snow," and "winter temperatures that ranged from below to above freezing (making conditions ripe for freezing of melted snow)").

This case is more analogous to Bragg v. Daimler Chysler, 2010 WL 3604428 (Mich. App. Sept. 16, 2010), in which the plaintiff, a lifelong Michigan resident, failed to see the ice before falling in the defendant's parking lot, and observed the patch of black ice that he slipped on only after getting up.  2010 WL 3604428, at *4.  There was no precipitation during the plaintiff's commute or when he exited his vehicle right before the fall, and although there was some snow on the ground, he observed there was no other snow or ice within a ten-foot radius of where he fell.  Id.  The court noted that "merely because it is wintertime in Michigan is not enough to render any weather-related situation open and obvious," and concluded there was a

_____

was "a three foot patch of ice," whereas the ice on which Lewars slipped was the size of a legal pad.  Holguin, 2012 WL 676658, at *2.

15

material question of fact regarding whether there was indicia of a potentially hazardous condition.  Id.

Lewars has presented sufficient evidence to raise questions of material fact concerning the condition of ice on the unloading ramp and the surrounding weather conditions.  Upon arriving at EFTEC, it was not actively precipitating, and Lewars observed only "trace" amounts of snow in the parking lot, and did not observe snow or ice on the unloading pad.[11]  Id. at 177. The evidence viewed in the light most favorable to Lewars also shows he was not aware of the ice patch before slipping.  See Kessler, 448 F.3d at 342 (whether plaintiff understood dangers presented was proper evidence "where it is used to establish that the danger was open and obvious") (citing Riddle v. McLouth Steel Products Corp., 485 N.W.2d 676, 681 (Mich. 1992)); Hoffner v. Lanctoe, 492 821 N.W.2d 88, 94, 101 (Mich. 2012) (factoring in plaintiff's admission that "she knew that the ice posed a danger" even though the open and dangerous doctrine is an "objective standard") (internal quotation marks excluded).  Lewars only saw a "clear piece of ice" when he "put [his] hand down to try to get back up."  12/2/14 Lewars Dep. at 187-88. Further, Lewars walked past the ice patch several times without noticing it, and until he fell, never felt anything slippery while walking around his truck.  Id. at 176, 179, 186.  Lewars also

---

[11]    Lewars and EFTEC provided weather reports that show below freezing temperatures on January 15 and 16, a "trace" amount of snowfall on January 15, and snowfall that began in the late morning on January 16 after Lewars left the EFTEC facility.  See Def.'s Mot. for S. J., Ex. 5; Pl.'s Resp., Ex. 7.  Further, Lewars's expert meteorological report stated there would have been a thin layer of ice on the parking lot and sidewalks due to frozen rainwater.  See Pl.'s Resp., Ex. 7 Bryan Rappolt Meteorological Report at 7.  Nevertheless, the evidence, viewed in the light most favorable to Lewars, is sufficient to raise a question of material fact regarding the nature of the ice conditions.

observed that Sheardown had no difficulty walking.[12]  Id. at 172.

There remain issues of material fact as to whether the icy patch Lewars slipped on was open and obvious.  A jury must decide whether an average person of ordinary intelligence would have been able to discover the danger and risk upon casual inspection, or whether there was indicia of a potentially hazardous condition that Lewars could have reasonably avoided. See Slaughter, 760 N.W.2d at 292-93.

II. Actual/Constructive Notice of Icy Condition

EFTEC alternatively argues that if it owed Lewars a duty of care because the icy condition was not open and obvious, there is no evidence it caused or had actual or constructive notice of the ice patch.[13]  Def.'s Mot. for S.J. at 24; Def.'s Reply at 17.

Under Michigan premises liability law, an invitee "must show that the defendant or its employees caused the unsafe condition or that the defendant knew or should have known of the unsafe condition."  Bragg, 2010 WL 3604428, at *5; see also Derbabian v. S & C Snowplowing, Inc., 644 N.W.2d 779, 706 (Mich. App. 2002).  Constructive notice can be inferred from evidence that the condition is of such a character or existed a sufficient length of time that the landowner should have had knowledge of it.  Bragg, 2010 WL 3604428, at *5.  However, "circumstantial evidence that ice may have formed under the weather conditions . . . does not

---

[12]     Sheardown testified that when he walked on the loading dock to retrieve a sample from the truck that arrived before Lewars, he "didn't notice any ice that was – any hazard."  12/4/14 Sheardown Dep. at 25.  The driver of that truck also did not complain of slippery conditions. Id. at 54.  Sheardown said the only condition he was aware of that was worth warning that driver was the ice "at the bottom of the pit."  Id. at 26.

[13]     EFTEC argues in its Reply that Lewars conceded this alternative argument because he "did not contest or rebut" it.  Def.'s Reply at 17.  However, Lewars did address this argument on pages 24-25 of his Response.  See Pl.'s Resp. at 24-25.

17

allow a reasonable inference that defendant had constructive notice of it."  Id. at *6; see also Altairi v. Alhaj, 599 N.W.2d 537, 543-44 (Mich. App. 1999) (meteorologist's affidavit of general weather conditions was not evidence of the defendant's knowledge of ice).   Moreover, a landowner is not expected to "inspect every inch of a parking lot for black ice" in order to fulfill his duty to invitees.   Bragg, 2010 WL 3604428, at *6.

Ronald Cohen, P.E. an engineering expert for Lewars, has opined that the ice that caused Lewars's fall "was an artificial presence . . . caused by leakage from the T2 Tank Farm that drained onto the truck ramp through a deficient concrete construction joint."[14]  Pl.'s Resp. at 9. EFTEC argues that Cohen ignored the actual location of where Lewars fell—"15 [feet] to 20 [feet] away from the small patches of ice Mr. Sheardown observed after the incident, and over 60 [feet] away from the patch of ice in the back of the truck well," which were the patches caused by the tank leakage.   Def.'s Mot. for S.J. at 25; Def.'s Reply at 16.

EFTEC further argues there is no evidence it, or its employees, were aware of the ice patch.   EFTEC notes weather conditions alone cannot signify constructive notice, see Def.'s Mot. for S.J. at 25 (citing Altairi, 599 N.W.2d at 544), and no one noticed the ice patch before Lewars fell; Lewars walked by the patch of ice four times before slipping, and neither Sheardown nor Walden observed the ice before or after the incident.   Id. at 25 (citing 12/4/14 Sheardown Dep. at 54-55; 12/4/14 Walden Dep. at 27-28); id. at 26 (citing Derbabian v. S & C Snowplowing, Inc., 644 N.W. 779, 784-85 (Mich. App. 2002) (where "it had not snowed for

---

[14]     Cohen further opined "[r]easonable concrete maintenance and concrete repair materials . . . would have sealed the leaking ramp-wall construction joint watertight and prevented the artificial formation of ice."  Pl.'s Resp. at 10, Ex. 6, Liability Report and Curriculum Vitae of Ronald J. Cohen, P.E.   Cohen concluded, "EFTEC was the proximate cause of the fall and injury" because it failed to inspect the premises, maintain the concrete construction joint, apply an anti-icing chemical, and at the least, provide a warning.   Id. at 11.

18

several days" and "no other person, including plaintiff, had observed the ice [in the shopping mall parking lot] before the fall," plaintiff failed to establish constructive notice of icy condition).

However, in their accident reports, both Sheardown and Burgess identified water leakage as the cause of the ice patch on the truck ramp. See supra at 4-5.   Walden also testified that he had continuously observed water leaking under the retaining wall and onto the surface of the truck ramp since 2009, 12/4/14 Walden Dep. at 13-14, and Sheardown testified he had reported the leakage problem and that it was a "constant issue," 12/4/14 Sheardown Dep. at 23. Although EFTEC argues, and presents photographs to demonstrate, that the artificially-created icy patches along the retaining wall were separate and far from the patch on which Lewars slipped, see Def.'s Reply at 13-15, it is for the jury to analyze the testimony and photographs to determine the cause of the ice patch in question.[15]   There is sufficient evidence in the record to raise a genuine issue of material fact whether EFTEC either caused or had notice of the existence of the ice patch on the loading ramp.

An appropriate Order follows.

---

[15]   Defendant also argues there were no "special aspects" that made the open and obvious hazard "unreasonably dangerous" or "effectively unavoidable."   Def.'s Resp. at 13-14. Michigan courts have found that an open and obvious danger may still create a duty in a land owner if "special aspects" made it unreasonably dangerous or unavoidable, such that there is a "uniquely high likelihood of harm or severity of harm if the risk is not avoided."   See Lugo v. Ameritech Corp, Inc., 629 N.W.2d 384 (Mich. 2001).   Because Lewars does not contest this point, I need not address it.

19